**COMMONWEALTH of Pennsylvania,**
**Appellant**

v.

**Duane Lee FREY, Appellee.**

Superior Court of Pennsylvania.

Submitted Nov. 28, 2011.
Filed March 20, 2012.
Reargument Denied June 1, 2012.

606

Duane Ramseur, Assistant District Attorney, York, for Commonwealth, appellant.

Jeffrey A. Conrad, Lancaster, for appellee.

BEFORE: BOWES, COLVILLE* and FITZGERALD**, JJ.

OPINION BY COLVILLE, J.:

The Commonwealth appeals the order granting Duane Frey's request for discovery in connection with his petition filed under the Post Conviction Relief Act ("PCRA"). We affirm the order.

### Facts

On May 25, 2002, Hopethan Johnson bought a motorcycle. At some point, he left the motorcycle in a garage belonging to a man named Stacey Farmer.

On May 26, 2002, at roughly 10:30 a.m., Johnson left a certain residence in order to meet friends. He did not reach the meeting place.

Also on May 26, 2002, at roughly 11:30 a.m., a neighbor of Stacey Farmer reported to police that she had heard approximately five gunshots in the woods behind Farmer's home. Upon investigating, police found nothing unusual, but did notice a truck registered to Frey in Farmer's driveway.

In June 2002, police received an anonymous tip that a murder had happened near Farmer's residence. During the ensuing investigation, police found shotgun wads in the woods behind Farmer's house. Also found near Farmer's home was a garbage bag containing, *inter alia*, Johnson's cell phone. Police found shotgun shells in Frey's house and car. Additionally, police located Johnson's motorcycle hidden under a pile of items near Frey's place of employment. Embedded in parts of the motorcycle were shotgun pellets.

Although Johnson's body had not yet been found, Frey was eventually arrested in connection with Johnson's death. Frey later admitted to the killing.

There are at least some indications in the record that police also suspected Farmer was connected, directly or indirectly, to Johnson's death. It appears police charged him with, *inter alia*, tampering with evidence in connection with the homicide. The allegations against Farmer seem to have included the claim that he had lied to police by giving false or incomplete information in one way or another as to what he knew about Johnson's demise.

---

* Retired Senior Judge assigned to the Superior Court.

** Former Justice specially assigned to the Superior Court.

It also appears police believed Farmer had helped Frey hide Johnson's motorcycle.

While Frey was in custody for Johnson's murder, Farmer was found shot dead in his driveway. At some point, police questioned Frey in connection with Farmer's death. Frey denied involvement. Although the reasons are not entirely clear to us, it seems that Farmer's manner of death was not determined to be a homicide until 2010.

There are indications in the record that, prior to the homicides in question, Johnson, Farmer and Frey had all been connected by drug activity. More particularly, it may be that Johnson sold drugs from Farmer's residence and Frey bought drugs from Johnson.

In 2003, Frey was convicted and sentenced for Johnson's murder and related charges. This Court affirmed his judgment of sentence. *Commonwealth v. Frey*, 872 A.2d 1270 (Pa.Super.2005). On December 30, 2005, the Pennsylvania Supreme Court denied his petition for allowance of appeal. *Commonwealth v. Frey*, 586 Pa. 722, 890 A.2d 1056 (2005). It does not appear that Frey petitioned the U.S. Supreme Court for a writ of certiorari.

Sometime in 2008, certain skeletal remains were found near the Susquehanna River. Also in 2008, the Commonwealth obtained a forensic report relating to the skeleton. Thereafter, apparently in 2010, the Commonwealth secured DNA testing that identified the remains as being those of Johnson.

On or after May 27, 2010, the Commonwealth mailed Frey and his counsel a letter indicating Johnson's skeletal remains had been discovered. It appears the Com-monwealth provided Frey a copy of the 2008 forensic report on or about June 8, 2010.

On or about July 30, 2010, Frey filed for relief under the PCRA.[1] His petition essentially sought a new trial based on after-discovered evidence—specifically, Johnson's remains and the forensic report relating thereto. Part of Frey's allegations was that the forensic report indicated Johnson's death may have occurred between six months and several years prior to the report. Frey essentially contended this new evidence cast doubt on the question of whether Johnson was killed in 2002, as the Commonwealth had maintained during Frey's trial.

Additionally, Frey alleged that the forensic report contained information indicating there were multiple sizes of shotgun pellets found in Johnson's skeleton. It was Frey's position that the information concerning the pellet sizes could reasonably suggest the existence of multiple shooters, thereby casting doubt on the Commonwealth's theory that Frey had been the only principal killer.

On or about October 29, 2010, Frey supplemented his PCRA petition, alleging that police first determined in 2010 that Farmer's death was a homicide. Subsequently, in PCRA proceedings convened by the court, Frey essentially took the position that Johnson's killer or an accomplice thereto may have killed Farmer, perhaps because the common killer feared Farmer was going to reveal facts which he knew about Johnson's death.

In March 2011, Frey filed a motion for discovery. More particularly, he sought discovery of police and ballistic reports,

---

1. This PCRA request was Frey's second. His first PCRA petition, filed in 2006, was denied. This Court was affirmed the denial. *Commonwealth v. Frey*, 998 A.2d 1024 (Pa.Su-per.2010). The Pennsylvania Supreme Court then denied Frey's petition for allowance of appeal. *Commonwealth v. Frey*, 608 Pa. 616, 8 A.3d 341 (2010).

eyewitness statements, photographs, and autopsy reports regarding the death of Stacey Farmer. Frey contended the requested information could demonstrate similarities between the murders of Farmer and Johnson, possibly evidencing a common shooter. Because Frey was incarcerated at the time of Farmer's death and, therefore, could not have shot Farmer, Frey's position was that proving a shooter common to both Farmer and Johnson could cast doubt on the Commonwealth's claim that Frey shot Johnson.[2]

The PCRA court granted Frey's discovery request. The Commonwealth later filed this timely appeal.

### Jurisdiction: Appealability of Order

■ The first issue is whether the order before us is appealable. We do not have jurisdiction over non-appealable orders. *Commonwealth v. Scarborough*, 9 A.3d 206, 210 (Pa.Super.2010). Orders are appealable if they are final, interlocutory and appealable by right or permission, or collateral. *Id.* For the reasons that follow, we find the order in this case is collateral and, therefore, appealable.

We have discussed collateral orders as follows:

A collateral order is one having all of the following characteristics: (1) it is separable from the main cause of action-that is, it may be addressed without analyzing the ultimate issue in the underlying case; (2) the right in question is too important to be denied review; and (3) the question presented is such that the claim will be irreparably lost if appellate review is postponed until final resolution

of the case. With respect to the second of the aforesaid characteristics, it is not enough that the issue at hand be important only to the litigants. Rather, the issue must involve rights deeply embedded in public policy going beyond the specific litigation before the court.

*Id.* at 211 (internal citations omitted).

■ We note that discovery issues often may be addressed without analyzing the underlying ultimate issue in a criminal case. *Id.* at 213.

The order at hand is a discovery order. Moreover, this particular discovery order is, in fact, separable from the main cause of action. That is, the question of whether Frey is entitled, under the PCRA, to discovery of the Farmer investigative documents can be addressed without analyzing the ultimate issue of whether Frey is entitled to a new trial under the PCRA.

Also, the question of whether the Commonwealth must disclose the requested materials relating to the Farmer investigation is too important to be denied review at this juncture. The question is crucial to the parties in this particular case because it appears Frey's substantive PCRA claims that he was wrongly convicted of shooting Johnson may be affected greatly by information in the Farmer file. Moreover, we are satisfied the issue of whether the Commonwealth must disclose material related to an ongoing murder investigation implicates rights deeply embedded in public policies. Those policy concerns touch upon the public's interest in effective investigation of crimes while seeing that claims of

---

2. Frey's PCRA allegations were somewhat fluid and were not phrased with absolute thoroughness or clarity. Even still, it seems evident that, underlying his position were these notions: if the person who shot Farmer also shot Johnson, that person could not have been Frey because Frey was incarcerated when Farmer was shot. Alternatively, if multiple people, perhaps two, were involved in shooting Johnson, and if Farmer was one of the two, and if the other was common to both shootings, then that remaining person was, again, not Frey because he was in custody when Farmer was shot.

wrongful convictions, such as in this case, are adjudicated fairly.

Additionally, if appellate review is postponed, the Commonwealth will need to disclose the material now. Any later ruling that the discovery was wrongly ordered, if there would be such a ruling, would not repair the loss of the Commonwealth's interest against disclosure.

In light of our foregoing discussion, we find the order before us meets the criteria of a collateral order. Accordingly, the order is properly appealable.

### Jurisdiction: Timeliness of PCRA Petition

■ The next issue is whether Frey's PCRA petition was timely. The PCRA court simply had no jurisdiction over his petition if it was late. *Commonwealth v. Wrecks,* 931 A.2d 717, 720 (Pa.Super.2007). Of course, the discovery order does not itself grant substantive PCRA relief. Nevertheless, that order arises because of the court's exercise of jurisdiction over Frey's PCRA petition. *See* 42 Pa.C.S.A. § 9545(d)(2); Pa.R.Crim.P. 902(E)(1). Thus, if Frey's petition was untimely, the PCRA court lacked jurisdiction to issue the discovery order in question.

For PCRA purposes, a judgment of sentence becomes final at the end of direct review, including discretionary review in the Pennsylvania Court and the U.S. Supreme Court, or at the expiration of the time limit for seeking that review. 42 Pa.C.S.A. § 9545(b)(3). After the Pennsylvania Supreme Court denies a petition for allowance of appeal, the petitioner has ninety days to seek discretionary review by the U.S. Supreme Court. U.S.Sup. Ct.R. 13.

Once a petitioner's judgment of sentence becomes final, the petitioner has only one year in which to file a PCRA petition unless the petitioner pleads and proves a statutory exception to the normal one-year filing deadline. 42 Pa.C.S.A. § 9545(b)(1). One such exception arises where the petitioner's underlying PCRA claim is based on previously unknown facts that could not have been obtained earlier through the exercise of due diligence. *Id.* § 9545(b)(1)(ii). This statutory exception, like any exception under Section 9545(b)(1), must be invoked within sixty days of when it first could have been raised. 42 Pa.C.S.A. § 9545(b)(2).

■ Frey's judgment of sentence became final in 2006, after his deadline passed for petitioning the U.S. Supreme Court for a writ of *certiorari.* His instant PCRA petition, having been filed more than one year after the finality of his judgment, was facially late. However, for the following reasons, we are satisfied that Frey successfully invoked a time-of-filing exception under 42 Pa.C.S.A. § 9545(b)(1)(ii), (2).

Frey's claim for substantive relief is based on the Commonwealth's forensic report and Johnson's skeletal remains. He has pled and demonstrated that those facts were previously unknown to him and could not have been earlier ascertained by the exercise of due diligence. Although the Commonwealth apparently secured the remains and a forensic report in 2008, the Commonwealth did not advise Frey about the discovery of the remains until late May 2010, and did not provide him with the forensic report until June 2010. Frey filed his PCRA petition within sixty days of receiving the Commonwealth's report. We are satisfied his petition was therefore timely.[3]

---

**3.** We realize the Commonwealth maintains Frey killed Johnson and knew where his re-

mains were. Frey's position is that he was wrongly convicted and that he did not know

■ Before leaving this issue, however, we point out the following. To the limited extent that the Commonwealth attempts to argue the petition was late, the Commonwealth wrongly focuses on the merits of Frey's underlying after-discovered evidence claim. An after-discovered evidence claim and the timeliness exception based on previously unknown facts are distinct. *Commonwealth v. Bennett*, 593 Pa. 382, 930 A.2d 1264, 1270–72 (2007). The issues are analyzed differently. *Id.* Thus, the relative merit of Frey's underlying PCRA claim is not the issue when determining whether his PCRA petition was timely. Rather, the question of whether he met the time-of-filing exception is evaluated pursuant to the statutory requirements of 42 Pa.C.S.A. § 9545(b)(1)(ii), (2). As we have explained, Frey satisfied those requirements in the PCRA court.

### Discovery Order: Abuse of Discretion?

The Commonwealth argues the PCRA court abused its discretion by ordering discovery. More specifically, the Commonwealth contends the court erred in finding exceptional circumstances warranting its order. For the following reasons, the Commonwealth's position fails.

■ In PCRA proceedings, discovery is only permitted upon leave of court after a showing of exceptional circumstances. 42 Pa.C.S.A. § 9545(d)(2); Pa.R.Crim.P. 902(E)(1). The PCRA and the criminal rules do not define the term "exceptional circumstances." Rather, it is for the trial court, in its discretion, to determine whether a case is exceptional and discovery is therefore warranted. *Common-*

*wealth v. Dickerson*, 900 A.2d 407, 412 (Pa.Super.2006).

■ We will not disturb a court's determination regarding the existence of exceptional circumstances unless the court abused its discretion. *Commonwealth v. Lark*, 560 Pa. 487, 746 A.2d 585, 591 (2000). An abuse of discretion is not a mere error in judgment. *Commonwealth v. Riley*, 19 A.3d 1146, 1149 (Pa.Super.2011). Instead, it is a decision based on bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law. *Id.* Moreover, we recall that the appellant has the duty to convince us an abuse occurred. *Commonwealth v. Bennett*, 19 A.3d 541, 543 (Pa.Super.2011).

■ Here, Frey's 2003 conviction followed the somewhat uncommon situation, though not an altogether unique one, where a murder trial was held when the decedent's body had not yet been found. Years later, when that body was discovered, the Commonwealth's own report revealed forensic evidence that could arguably suggest multiple persons were involved in the shooting death. The Commonwealth does not maintain that the existence of multiple shooters was part of its initial prosecution theory or that such a theory was supported by discovery materials to which Frey had access during his trial. The forensic report at issue here did not exist until 2008, after the remains were discovered; the report was not given to Frey until 2010.

With the backdrop of these somewhat unusual facts, the record before us indi-

---

the location of the remains. Of course, even if Frey did kill Johnson, that guilt does not necessarily mean he knew where the remains were ultimately deposited because, as the record suggests, multiple persons may have been involved in Johnson's death. In any event, were we to follow the Commonwealth's argu-

ment, we would effectively deny Frey the right to invoke the statutory exception at issue merely because he was convicted of the killing. The PCRA was plainly not designed to deny convicted persons the right to invoke it or its various sections.

cates Frey, Johnson and Farmer were involved together in nefarious activities, most likely drug-related, that may well have been connected to both Johnson's and Farmer's homicides. Police arrested Frey for killing Johnson. Police suspected Farmer was directly or indirectly involved in Johnson's death. The Johnson and Farmer homicides occurred close in time and at very nearly the same location. Police testimony offered during a hearing related to Frey's PCRA discovery request revealed that some of the same witnesses questioned in connection with Johnson's death were also questioned with respect to Farmer's demise. All of these facts, taken together, reasonably support the belief that the two homicides may well have been connected.

■ We understand that the Commonwealth offered PCRA testimony from a police officer who opined that the two homicides were unrelated. However, the PCRA court was not obligated to accept that testimony and, in fact, disagreed with it. More particularly, the court specifically concluded, "it is certainly possible that an unknown accomplice to the Johnson murder subsequently killed Farmer based upon the belief that Farmer was going to cooperate with the police in the Johnson investigation." PCRA Court Opinion, 06/30/11, at 3. Based on the multitude of facts before it, the court determined "the facts of both homicides indicate that they may have been related, and that an unknown third party may have been involved in both." *Id.* at 4. These conclusions by the court are supported by the facts of record we have already discussed.

Even still, the Commonwealth points out that the PCRA court expressed some skepticism about whether the various theories underlying Frey's PCRA petition (*e.g.*, that some unknown person who killed Farmer might have been the person, or one of the persons, who killed Johnson) will ultimately prove to be true. Nevertheless, the court's expression of skepticism was accompanied by the court's rational analysis and conclusion that it was "certainly possible" that an unknown person who was involved in the Johnson murder later killed Farmer. *Id.* This possibility, in the context of the somewhat uncommon case facts discussed *supra*, led the court to conclude that this matter was an exceptional one.

■ Of course, mere speculation that exculpatory evidence might exist does not constitute an exceptional circumstance warranting discovery. *Dickerson*, 900 A.2d at 412. The PCRA court recognized this legal principle. PCRA Court Opinion, 06/30/11, at 3. However, once again, the court reasoned that the facts in this case suggested a particular link—*i.e.*, a common killer or an accomplice thereto—between the two homicides. It is not manifestly unreasonable to conclude that witness statements and/or other evidence contained in the Farmer investigative file would thus be relevant to the facts of the Johnson murder.

■ The Commonwealth, nonetheless, characterizes Frey's discovery request as a "fishing expedition." Appellant's Brief at 16. This characterization is unjustified. The fact that Frey does not know for certain what the Farmer investigation file contains does not mean he is improperly "fishing." Parties frequently do not know with certainty the contents of requested materials. Indeed, this lack of knowledge is often the main reason, though not the only possible reason, that discovery requests are made in criminal cases.

Frey made particular requests for specific documents relating to the investigation of Farmer's death based on the reasonable theory that those documents may

well contain evidence tending to show a killer common to Farmer and Johnson. Moreover, facts of record do show a link between the cases and do reasonably support the belief that the Farmer investigative documents may contain the kind of evidence Frey seeks. Moreover, evidence of a common killer may arguably support one or more of Frey's PCRA theories. Thus, this case does not involve a baseless or speculative request properly described as a "fishing expedition."

We note also that the Commonwealth again spends effort attempting to show that Frey does not deserve relief on his underlying after-discovered evidence claim. While we understand it is important to recognize the substance and contours of the underlying claim when considering the propriety of a discovery request, the question before us is not whether Frey is entitled to substantive relief. Instead, the question on this appeal is whether the PCRA court abused its discretion when deciding to order discovery.

In summary, the record and the PCRA court's opinion demonstrate the court considered the appropriate law, evaluated the facts, and determined that this case involves exceptional circumstances—namely, the somewhat unusual case history, the reasonable possibility of a common killer and the reasonable belief that the Farmer investigative documents may reveal evidence supporting one or more of Frey's PCRA theories. In light of these exceptional circumstances, the court ordered discovery of the Farmer documents. The Commonwealth simply has not established that bias, partiality, prejudice, or ill will guided the PCRA court's determination that this case is exceptional and that discovery is in order. Similarly, the Commonwealth has not persuaded us the court's ruling was manifestly unreasonable or was a misapplication of the law. Conse-

quently, we are not convinced the court abused its discretion. As such, the Commonwealth has not shown it is entitled to relief.

■ Finally, the Commonwealth contends that releasing information regarding the Farmer homicide would be detrimental to the ongoing investigation in that case. Indeed, this contention is part of what led us to conclude the order on appeal had sufficient public importance so as to render the order collateral and appealable. In its brief, the Commonwealth sets forth some legal principles relating to discovery. In terms of factual analysis, however, the Commonwealth merely points to the opinion offered by an investigating detective that the two subject homicides were unrelated and that releasing information would be a detriment to the Farmer investigation. That opinion consisted of a cursory statement with little, if any, supporting facts other than the officer's assertion that search warrants on the Farmer case had been sealed.

In short, the Commonwealth's brief presents no developed factual discussion as to how detriment might result. We fully understand that, if revealing facts would be harmful, the Commonwealth might find it difficult to offer details or, at least, difficult to offer any significant amount thereof. However, the Commonwealth does not offer even a general explanation other than urging us to accept the detective's unsupported opinion, an opinion rejected by the PCRA court.

It would be improper for this Court to act as counsel for a party. *Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa.Super.2007). That is, we must not write a party's brief and develop the analysis necessary to support the party's position. *Id.* There might well be arguments in support of the Commonwealth's theory that would warrant a vacation or reversal of the

PCRA court's order, but it would be inappropriate for us to craft them, regardless of how important the Commonwealth's issue might be.

Based on our foregoing discussion, the Commonwealth has not demonstrated that it is entitled to relief. As such, we affirm the PCRA court's order.

Order affirmed.

Judge BOWES files a Dissenting Opinion.

## DISSENTING OPINION BY BOWES, J.:

I believe that Appellee's discovery request, wherein he sought to uncover what he purported would be exculpatory evidence, was baseless; hence, I dissent.

On April 23, 2003, a jury convicted Appellee of first degree murder, arson, receiving stolen property, and tampering with evidence. These charges arose from the May 26, 2002 death of Hopethan Johnson, who sold crack cocaine to Appellee, and Appellee's subsequent actions of hiding the body and destroying a car used to transport it. The evidence viewed in the light most favorable to the Commonwealth was as follows. On the date in question, which was the Sunday of Memorial Day weekend, Stacey Farmer's neighbor heard two gunshots and, after a pause, three more gunshot blasts emanating from a wooded area behind Farmer's house. The neighbor reported the matter to police, who went to Farmer's house and found nothing unusual. At that time, police did see a truck registered to Appellee in Farmer's driveway. After Appellee was arrested for Johnson's murder and in jail awaiting trial, Farmer was shot in the head and killed.

The Commonwealth's evidence established that Appellee believed that Johnson was overcharging him for drugs and wanted to kill him. First, just prior to the murder, Appellee had conversations with David Holloway, who also sold Appellee drugs. Holloway reported that Appellee was irate with Johnson, believed that Johnson and Holloway had cheated him financially, and said that he planned to "get a shotgun and start taking mother f____s out." N.T. Trial, 4/21–25/03, at 156.

Darin Stump testified similarly. He was Appellee's friend and met Johnson in 2000. He recalled that prior to the Memorial Day weekend of 2002, Appellee was "upset with some of the dealings that [Appellee and Johnson] had between them." *Id.* at 176. Appellee felt either that he was not provided a sufficient amount of drugs for the money that he was paying Johnson or that Johnson was charging him too much money for the drugs that Appellee bought. Appellee told Stump that, "he was going to get the n____r." *Id.* at 178.

Chad Snyder knew Farmer, Appellee, and Johnson in 2002. On one occasion, Appellee and Snyder purchased drugs from Johnson, and immediately after Johnson left the area, Appellee told Snyder, "I'd like to kill him." *Id.* at 195. Appellee also said that, "he had a shotgun behind the seat" of his car, and that "he was going to shoot [Johnson] with it." *Id.* at 196.

Commonwealth witness Holly Strausbaugh testified as follows. She was Stacey Farmer's girlfriend in May 2002 and was living at his home. About one-half hour after the murder, Stacey Farmer "was like all freaked out," and told Strausbaugh that Appellee shot Johnson and that "he[, Farmer,] was out in the back yard and he saw it." *Id.* at 333.[1] After this conversa-

---

1. Farmer's statement to Ms. Strausbaugh was admitted into evidence as an excited utter-

ance, and, on direct appeal, we affirmed the trial court's ruling in this respect. *Common-*

tion occurred, Appellee left Farmer's house and returned later that day. At that time, Appellee started "looking for any of [Johnson's] stuff. He got his helmet and there was a jacket laying there and he got that." *Id.* at 339. Appellee said, "that he had shot him for nothing because he didn't find no money or no crack." *Id.* at 340. After Appellee looked through Johnson's jacket, he found some crack and that "seemed to make him a little happier." *Id.* Strausbaugh also overheard Appellee tell Farmer that he took Johnson's car "to Pittsburgh to get rid of it." *Id.* at 347. A couple of days after the shooting, Strausbaugh, Appellee, and Farmer were in Appellee's truck together when Farmer asked Appellee what he did with the body and told Appellee that he should give it to Johnson's family. In response, Appellee "just freaked out, just started saying don't ever f____g ask me again what I did with it," and that "nobody would ever know where it was." *Id.* at 348–49.

Appellee confessed to police that he had murdered Johnson. Specifically, Appellee told police that he owed Johnson money and that he was afraid of Johnson because Johnson had pointed a gun at him and his girlfriend. Appellee informed police that he shot Johnson with a twenty gauge shotgun while Johnson was in Stacey Farmer's backyard. However, Appellee refused to tell police where Johnson's body was located. Detective Donald Hopple, Jr., heard Appellee make a second confession. Specifically, Detective Hopple observed an interaction between Appellee and his mother in the courtroom. Appellee's mother hugged Appellee and told him not to take the blame for a murder that he did not commit. At that point, Appellee "leaned down to her and told her that he did it, that he killed him." *Id.* at 513.

The Commonwealth also established the following. On the day of the murder, Johnson borrowed Stephanie Summer's car in order to ride a motorcycle that he stored in Stacey Farmer's garage. That was the last time anyone saw Johnson. Ms. Summer's car was later discovered destroyed by fire. Police also found Johnson's motorcycle hidden under tarps behind Appellee's place of employment. There were twelve gauge shotgun pellets recovered from the odometer and speedometer of Johnson's motorcycle and an area behind Farmer's house. Twelve gauge shotgun shells were located in Appellee's truck and residence. Both a twelve gauge and a twenty gauge shotgun were discovered in Appellee's home after the murder.

Based on this evidence, Appellee was found guilty of the above-described crimes. On May 19, 2003, he was sentenced to life imprisonment, and, on appeal, we affirmed. *Commonwealth v. Frey,* 872 A.2d 1270 (Pa.Super.2005) (unpublished memorandum). After our Supreme Court denied review, Appellee filed a timely PCRA petition, counsel was appointed, and the PCRA court conducted an evidentiary hearing. PCRA relief was denied, and, on appeal, we affirmed and rejected seven allegations of error. *Commonwealth v. Frey,* 998 A.2d 1024 (Pa.Super.2010) (unpublished memorandum).

On July 20, 2010, Appellee filed a counseled motion for a new trial based upon after-discovered evidence alleging the following. On June 2, 2010, Appellee discovered through a news outlet that a body was recovered on March 25, 2008, and in 2010, it was identified as Johnson's remains through DNA testing. Appellee asked for a copy of the autopsy, which he received on June 8, 2010. Appellee con-

*wealth v. Frey,* 872 A.2d 1270 (Pa.Super.2005)    (unpublished memorandum).

tended that the autopsy results demonstrated that he was entitled to a new trial and that the motion for such was timely under 42 Pa.C.S. § 9545(b)(1) because it was filed within sixty days of Appellee's receipt of the autopsy.

Appellee posited that the autopsy provided exculpatory evidence that would likely compel a different verdict in the following respects. First, the coroner stated that the date of death was anywhere between six months to several years prior to the 2008 discovery of the remains and Appellee therefore could not have murdered Johnson in 2002. Second, two sizes of pellets were found on either side of the body. Appellee noted that there was a disparity in the evidence about what size shotgun he used to murder Appellee and thus, the different sized pellets found in the skeletal remains was a critical fact. Third, Appellee noted that there was evidence that Johnson was killed on his motorcycle but the skeletal remains demonstrated no evidence of trauma that would accompany a fall from a moving motorcycle.

Then, on October 29, 2010, Appellee filed a "Supplemental Motion for New Trial Based upon After–Discovered Evidence under 42 Pa.C.S. § 9545(b)(1)(ii) and (b)(2)." In this petition, Appellee claimed that he discovered on August 30, 2010, that Farmer's death was a homicide and the fact that Farmer's death was a homicide would likely compel a different verdict in this matter on the following basis:

29. At the time of Farmer's death, Defendant was in custody.

30. Defendant could not have been responsible for Farmer's death.

31. As the police had ruled Farmer's death a homicide, Farmer's killer still remains in the community.

32. Because investigators only recently determined that Farmer was mur-

dered, the jury was unable to hear testimony concerning Farmer's death.

33. Had the jury heard this evidence, it is likely that they would have concluded that the deaths of Farmer and Johnson were related.

34. Because Defendant could not have killed Farmer, and because the jury heard testimony that Farmer killed Johnson [from Appellee's girlfriend] it is likely that a jury could have inferred that Farmer's killing was in retaliation for his killing Johnson.

35. In the alternative, had the jury known that Farmer, too, had been murdered they could have easily and correctly reasoned that the individual that killed Johnson also came back to the same location and killed Farmer.

36. This would have led to reasonable doubt that Defendant killed Johnson and would have compelled a not guilty verdict.

Supplemental Motion for New Trial Based upon After–Discovered Evidence under 42 Pa.C.S. § 9545(b)(1)(ii) and (b)(2), 10/29/10, at ¶¶ 29–36.

It was in connection with this second, October 29, 2010 motion for a new trial that Appellee was granted discovery; specifically, he was granted access to Farmer's murder investigation file based on the above allegation that the information was necessary for him to show similarities between the deaths of Farmer and Johnson and that the same person shot both men.

Discovery in the PCRA context is governed by Pa.R.Crim.P. 902, which states in relevant part that "(1) Except as provided in paragraph (E)(2), no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing

of exceptional circumstances." Pa. R.Crim.P. 902(E)(1). Our Supreme Court has had numerous opportunities to interpret this rule in the death penalty context, which is covered by Pa.R.Crim.P. 902(E)(2). That portion of the rule indicates, "On the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause." Our Supreme Court has consistently concluded that good cause for discovery in the PCRA context, a lesser standard than exceptional circumstances, is not present based upon unsubstantiated allegations that the requested information might reveal potentially exculpatory evidence.

A recent example is *Commonwealth v. Hanible*, —— Pa. ——, 30 A.3d 426 (2011). Therein, the defendant claimed that he should have been granted access to ballistic reports and his homicide file. The Supreme Court observed that a "showing of good cause requires more than just a generic demand for potentially exculpatory evidence." *Id.* at 484 (quoting *Commonwealth v. Collins*, 598 Pa. 397, 957 A.2d 237, 272 (2008)). With respect to the ballistics report, the defendant argued that it might have been exculpatory to him. In response, the Commonwealth noted that the defendant's position that the ballistics report could provide exonerating material was completely speculative and that the defendant did not provide any basis for his position that the report might reveal exculpatory information. The Court agreed that the defendant was not permitted access to the ballistics report because he "failed to make any showing of good cause why this information, if it existed, would have been exculpatory to him." *Hanible, supra* at 484.

The Supreme Court similarly dismissed the defendant's request for access to his homicide file, which was sought due to the fact that it might contain evidence exculpatory to him, information that could have impeached the credulity of Commonwealth witnesses, and might have proven another individual guilty of the crime. Again, the Court denied the defendant access to the file because the defendant's position that any of the delineated evidence existed was conjectural. It stated, "As with the previous claim, [the defendant] has not made a showing of good cause as he is unaware whether exculpatory information even exists." *Id.* (footnote omitted).

*Hanible* is merely the latest in a series of decisions wherein the Supreme Court has upheld a refusal to grant discovery in the PCRA setting. The Supreme Court cases are marked by a uniform position: discovery is unwarranted when the defendant presents a conjectural and unsubstantiated allegation that the requested material might prove him innocent. In *Commonwealth v. Collins, supra*, the PCRA court denied the defendant's discovery request of his homicide file because his position that it might reveal possible trial court errors or exculpatory evidence was speculative. Our Supreme Court affirmed, noting the "PCRA discovery request was the same sort of generic plea for hypothetical evidence that we have rejected as falling far short of the 'good cause' requirement of Rule 902(E)(2)." *Id.; see also Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220 261 (2006) ("speculation that requested documents will uncover exculpatory evidence does not satisfy the requirements of Rule 902(E)(2)"); *Commonwealth v. Bridges*, 584 Pa. 589, 886 A.2d 1127 (2005) (unsubstantiated position that a Commonwealth witness was a paid informant and drug trafficker did not warrant discovery because there was no factual basis for the position). The predecessor to Pa. R.Crim.P. 902 was Pa.R.Crim.P. 1502,

which contained identical language, and was interpreted consistently. *See Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167 (1999).

In the present case, Appellee has leveled unsubstantiated allegations that the investigatory files of Stacey Farmer might reveal that Farmer's murderer is identical to the man who murdered Johnson. Not only does Appellee fail to offer a scintilla of support for this conjecture, the claim borders on the absurd. Appellee told three of his friends he wanted to kill Johnson. Appellee confessed to police to killing Johnson with a shotgun. Farmer told his girlfriend that he saw Appellee killed Johnson. Appellee also made incriminatory remarks to Farmer's girlfriend following the murder. Detective Hopple overheard Appellee admit to his mother that he killed Johnson. There was physical evidence linking Appellee to the crime. Johnson's motorcycle, embedded with shotgun pellets, was found behind Appellee's place of employment, and police observed Appellee's truck parked at the murder scene immediately after Johnson was killed.

In my view, Appellee has utterly failed to establish good cause for discovery of Farmer's murder file, much less the higher standard of exceptional circumstances applicable in this case. His position that Farmer's murderer and Johnson's murderer might be the same person is untenable. Hence, I respectfully dissent.